IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Action No.  11-cv-00728-PAB-KLM

KENT D. MENGE,

     Plaintiff,

v.

AT&T, INC., a Delaware corporation,
AT&T UMBRELLA BENEFIT PLAN NO. 1,
AT&T OPERATIONS, INC., a Delaware corporation, and
THE AT&T DISABILITY INCOME PROGRAM,

     Defendants.

---

**ORDER**

---

This matter is before the Court on Plaintiff's Opening Brief [Docket No. 28] filed by plaintiff Kent D. Menge against defendants AT&T Inc., AT&T Umbrella Benefit Plan No. 1, AT&T Operations, Inc., and the AT&T Disability Income Program (collectively, "AT&T").  Plaintiff seeks review of defendants' denial of his claim for short-term and long-term disability benefits.

## I.  BACKGROUND

Plaintiff was an employee of AT&T Operations, Inc. from April 18, 2007 through September 15, 2008.  Docket No. 28 at 5, ¶ 11; Docket No. 30 at 17, ¶ 1.  As an employee, plaintiff participated in the SBC Umbrella Plan No. 1[1] (the "Plan"), a retirement benefit umbrella plan governed by the Employee Retirement Income Security

---

[1]This plan is now known as the AT&T Umbrella Benefit Plan No. 1.  Docket No. 28 at 6, ¶ 13; Docket No. 30 at 18, ¶ 6.

Act ("ERISA"), 29 U.S.C. §§ 1001, *et seq*.  Docket No. 28 at 6, ¶ 12; Docket No. 30 at 18, ¶ 6; R. at 36.  The Plan provides both short-term and long-term disability benefits to qualified participants.  Docket No. 28 at 6, ¶ 17; Docket No. 30 at 18, ¶ 6; R. at 156.

On September 26, 2007, plaintiff was rear-ended while driving into the AT&T parking lot.  Docket No. 28 at 9, ¶ 27; Docket No. 1 at 3, ¶ 17; Docket No. 7 at 3, ¶ 17. Plaintiff alleges that, following the accident, his mental and physical condition deteriorated: he suffered from chronic pain, memory deficits, depression, and bipolar disorder.  Docket No. 28 at 10, ¶¶ 29-31.

In April 2008, plaintiff submitted a claim to the AT&T Integrated Disability Service Center (the "IDSC") for short-term disability benefits beginning on April 11, 2008.  R. at 518.  Under the Plan, a claimant qualifies for short-term disability benefits if, "because of illness or injury," he is "unable to perform all of the essential functions of [his] job or another available job assigned by the Participating Company, with the same full- or part-time classification for which the employee is qualified."  R. at 942.  After reviewing medical information from plaintiff's primary care physician, Kari Kearns, and plaintiff's chiropractor, Evan Katz, the IDSC approved his claim for benefits from April 18, 2008 through May 18, 2008.  R. at 555.

On June 2, 2008, the IDSC denied plaintiff's claim for benefits from May 19, 2008 through plaintiff's return to work, R. at 639, which the IDSC later determined to be July 11, 2008.[2]  R. at 758.  From May 19, 2008 through July 10, 2008, plaintiff was on leave pursuant to the Family and Medical Leave Act ("FMLA").  *See* 29 U.S.C. § 2601

---

[2]The IDSC initially informed plaintiff that the maximum potential short-term benefits for which he was eligible would run through October 16, 2008.  R. at 619.

*et seq.* Over the summer of 2008, plaintiff submitted records from additional healthcare providers; the IDSC reviewed these records but did not alter its determination. *See* R. at 657, 670, 686, 734.

Plaintiff disputed and continues to dispute the determination that he returned to work on July 11, 2008, on the basis that he never returned to work, but instead began using vacation and personal days on July 11 when his FMLA leave ran out. R. at 768-69; Docket No. 34 at 15. Once plaintiff exhausted his vacation days, his supervisor allowed him sixty days to remain at home and search for other jobs within the company that he would be able to perform. R. at 770, 781 ("If at the end of the sixty (60) day job search period, you have not been successful in finding another position that will accommodate your work restrictions, you will be removed from the AT&T payroll."); Docket No. 28 at 21-23. Plaintiff was unable to find another position and was terminated on September 15, 2008. *Id*. He contends that the period of review for his benefits claim should run from May 19, 2008 through the present because he was never able to return to work. *Id*.

On November 14, 2008, plaintiff appealed the denial of short-term disability benefits after May 19, 2008. R. at 755. In a letter sent on January 9, 2009, plaintiff's attorney stated that, "should Mr. Menge's disability continue beyond May 19, 2009, then he will be entitled to long term benefits under the Plan." R. at 770. The letter set forth plaintiff's requests that the "previous denial of his claim for disability benefits be reversed," "benefits be paid up to the present," and the IDSC issue a determination that plaintiff's "disability is continuing at this time." R. at 776.

On appeal, the IDSC's Quality Review Unit ("QRU") reviewed medical records

3

submitted by Drs. Kearns and Katz, as well as by psychiatrist Frederick Sakamoto, neuropsychologist Mark Zacharewicz, internist Elizabeth Yurth, chiropractor Margaret Seron, and radiologist David Oppenheimer.  R. at 942.  The QRU retained five independent physician advisors to review plaintiff's file.  R. at 943-44.

On February 27, 2009, the QRU denied plaintiff's appeal.  R. at 944.  The QRU found that none of plaintiff's documented conditions were "so severe as to prevent" him from "performing the duties of his job as Sales Executive I Remote PCG, with or without reasonable accommodation from May 19, 2008 through July 10, 2008."  R. at 944.

In March 2009, plaintiff applied for Social Security Disability Insurance.  R. at 390.  On December 9, 2009, he was awarded benefits.  R. at 395.

On March 23, 2011, plaintiff filed this case, alleging that AT&T arbitrarily and capriciously denied his claim for benefits from May 19, 2008 onwards and requesting relief under 29 U.S.C. § 1132(a)(1)(B).  Docket No. 1 at 14.  Plaintiff seeks short-term disability benefits from May 19, 2008 through July 10, 2008 at the rate of $1,730.08 per month; long-term disability benefits from July 18, 2008 through February 18, 2012, at the rate of $1,745.00 per month or until he has received a total of $75,035.00; a penalty pursuant to 29 U.S.C. § 1132(c)(1) of $110 per day from December 5, 2010 through May 4, 2011; and reasonable attorney's fees, costs, and interest.  Docket No. 28 at 24-25, ¶¶ 67-70.

## II.  STANDARD OF REVIEW

Plaintiff argues that the Court should apply a de novo standard of review or a standard of "reduced deference to the plan administrator."  Docket No. 28 at 5, ¶ 10. Defendants argue that the applicable standard is abuse of discretion.  Docket No. 30 at

4

7.

AT&T Inc. is both the Plan Sponsor and the Plan Administrator.  R. at 993.  The

Plan provides that:

> The Plan Administrator (or, in matters delegated to third parties, the third
> party that has been so delegated) will have sole discretion to interpret the
> Program, including, but not limited to, interpretation of the terms of the
> Program, determinations of coverage and eligibility for benefits, and
> determination of all relevant factual matters.  Any determination made by the
> Plan Administrator or any delegated third party will not be overturned unless
> it is arbitrary and capricious.

R. at 995.  With respect to the AT&T Disability Income Program (the "Program"), a third-

party "Claims Administrator has been delegated authority by the Plan Administrator to

determine whether a particular Eligible Employee who has filed a claim for benefits is

entitled to benefits."[3]  R. at 995.

When a retirement plan grants the plan administrator discretionary authority to

determine eligibility for benefits, the Court reviews the administrator's decision for an

abuse of discretion.  *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).

The administrator's decision will be upheld so long as it is not arbitrary and

capricious–that is, so long as it is supported by "substantial evidence" and "is

predicated on a reasoned basis."  *Adamson v. Unum Life Ins. Co.*, 455 F.3d 1209, 1212

(10th Cir. 2006) (internal citation omitted).  "[T]here is no requirement that the basis

relied upon be the only logical one or even the superlative one."  *Id*.  A review for abuse

of discretion "is limited to determining whether the interpretation of the plan was

reasonable and made in good faith."  *Kellogg v. Metro. Life Ins. Co.*, 549 F.3d 818, 826

---

[3]The Claims Administrator for disability benefits during the relevant time period
was Sedgwick Claims Management Services.  R. at 61, 92, 124.

(10th Cir. 2008) (internal citations and alterations omitted).  Substantial evidence "is such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the decision maker."  *Rekstad v. U.S. Bancorp.*, 451 F.3d 1114, 1119-20 (10th Cir. 2006).

Where the same entity both administers a retirement plan and pays plan benefits out of its own funds, a conflict of interest exists that does not alter the standard of review, but rather constitutes one factor to be considered in deciding whether there has been an abuse of discretion.  *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 117 (2008) ("when judges review the lawfulness of benefit denials, they will often take account of several different considerations of which a conflict of interest is one").  A conflict of interest, like any other factor relevant to the analysis, "will act as a tiebreaker when the other factors are closely balanced."  *Id*. at 117.  Thus, a conflict of interest "should prove more important . . . where circumstances suggest a higher likelihood that it affected the benefits decision" and less important "where the administrator has taken active steps to reduce potential bias and to promote accuracy."  *Id*.  In *Glenn*, the Court considered several factors in addition to the conflict of interest, including the fact that the plaintiff, MetLife, had (1) encouraged the defendant to argue to the Social Security Administration ("SSA") that she could not work; (2) received the bulk of the Social Security benefits she was subsequently awarded; (3) failed to provide all relevant medical evidence to its independent reviewers; (4) emphasized those parts of the record that disfavored the defendant's claim and de-emphasized those parts of the record that favored it; and (5) ignored the SSA's finding in concluding that the defendant could perform sedentary work.  *Id*. at 118.

6

There is no dispute that the Plan grants the Plan Administrator discretion in interpreting the terms of the Plan and making individual decisions regarding the payment of benefits.  *See* R. at 48.  Nor is there any dispute that AT&T Inc. is both the sponsor and the administrator of the Plan.  *See* Docket No. 30 at 10.

Plaintiff asserts that "[a]ll of the factors mentioned in *Glenn* are present here." Docket No. 28 at 4, ¶ 6.  However,  the relevant facts in this case differ significantly from *Glenn*.  R. at 163.  Plaintiff did not receive a determination of his disability claim until December 2009–eleven months after defendants denied his appeal.  R. at 395, 942.  Thus, defendants could not have wrongfully ignored the Social Security disability determination because it had not been issued at the time the appeal was decided.[4] *See Nelson v. Aetna Life Ins. Co.*, 2013 WL 2177876, at *11 (N.D. Okla. May 20, 2013) ("Aetna cannot be faulted for failing to consider a social security award that was not in existence at the time it made its decision").  Nor is there any evidence that an offset was applied against the short-term disability benefits that plaintiff did receive from defendants.  Furthermore, the plan administrator "took steps to reduce its inherent bias" by retaining five independent reviewing physicians to consider plaintiff's claim.  R. at 942-44; *see Holcomb v. Unum Life Ins. Co. of Am.*, 578 F.3d 1187, 1193 (10th Cir. 2009).  The record shows that defendants provided the medical reviewers with all relevant evidence and, as will be discussed further below, there is no indication that

---

[4]Plaintiff argues that the conflict of interest influenced the determination because he was required to apply for Social Security benefits.  Docket No. 34 at 4-5, ¶ 6.  In contrast to *Glenn*, the requirement that plaintiff apply for Social Security was included in the terms of the plan itself.  No conflict of interest arose from the plan administrator applying this plan term.  Under plaintiff's logic, the existence of the plan term would create a conflict of interest even for an independent plan administrator.

defendants weighed the evidence in bad faith.  Taking all of these factors into account, the Court finds that the conflict of interest does not warrant a heightened standard of review.

Plaintiff also argues that the Court should review the determination de novo pursuant to Colo. Rev. Stat. § 10-3-1116, which provides that:

> An insurance policy, insurance contract, or plan that is issued in this state shall provide that a person who claims health, life, or disability benefits, whose claim has been denied in whole or in part, and who has exhausted his or her administrative remedies shall be entitled to have his or her claim reviewed de novo in any court with jurisdiction and to a trial by jury.

Colo. Rev. Stat. § 10-3-1116(3).  Defendants argue that this section is preempted by ERISA and that it does not apply to the Plan in any event because the Plan is funded by a trust, and not by insurance, and because the Plan was not issued in Colorado. Docket No. 30 at 14-16.

The Court need not reach this dispute because plaintiff's coverage under the Plan began in April 2007, *see* Docket No. 28 at 5-6, ¶¶ 11-12, over one year before the statute took effect on August 8, 2008 and the statute does not apply retroactively. *McClenahan v. Metro. Life Ins. Co.*, 416 F. App'x 693, 695-96 (10th Cir. 2011); *Holingshead v. Stanley Works Long Term Disability Plan*, No. 10-cv-03124-WJM-CBS, 2012 WL 959402, at *2 (D. Colo. Mar. 21, 2012) ("As the Plan came into effect before Colo. Rev. Stat. § 10-3-1116 was enacted, the Court finds that the statute cannot retroactively apply to Plaintiff's claim."); *Kohut v. Hartford Life & Accident Ins. Co.*, 710 F. Supp. 2d 1139, 1150 (D. Colo. 2008) ("the Court finds no evidence of legislative intent to apply section 10-3-1116 retroactively, and accordingly finds that it operates prospectively").

The Court concludes that defendants' determination is subject to review for abuse of discretion.

## III. DISCUSSION

Under ERISA, a plan administrator must accord a claimant a "full and fair" assessment of claims and clearly communicate "specific reasons" for the denial of benefits. *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825 (2003) (citing 29 U.S.C. § 1133 and 29 C.F.R. § 2560.503-1). When a claimant appeals a disability determination, the administrator must "[p]rovide for a review that takes into account all comments, documents, records, and other information submitted by the claimant relating to the claim." 29 C.F.R. § 2560.503-1(h)(2)(iv). The essential elements of a "full and fair review" are (1) knowing what evidence the decision-maker relied on; (2) an opportunity to challenge that evidence; and (3) consideration by the decision-maker of the evidence presented by both parties. *Brown v. Retirement Committee of Briggs & Stratton Retirement Plan*, 797 F.2d 521, 534 (7th Cir. 1986).

While a plan administrator may not "arbitrarily refuse to credit a claimant's reliable evidence," there is no requirement that administrators "credit the opinions of treating physicians over other evidence relevant to the claimant's medical condition." *Black & Decker*, 538 U.S. at 825, 834. "[N]or may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation." *Id*. at 834. "[W]hen a plan administrator chooses to rely upon the medical opinion of one doctor over that of another . . ., the plan administrator's decision cannot be said to have been arbitrary and capricious because it

would be possible to offer a reasoned explanation, based upon the evidence, for the plan administrator's decision." *McDonald v. Western-Southern Life Ins. Co.*, 347 F.3d 161, 169 (6th Cir. 2003).  The Court's role is not to "referee a battle of physicians or to decide whether" defendants' determination was "correct," but "simply to determine whether [defendants] reasonably exercised [their] discretion and based [their] determination on substantial evidence." *Rizzi v. Hartford Life & Accident Ins. Co.*, 613 F. Supp. 2d 1234, 1249 (D.N.M. 2009).

### A.  Denial of Short-Term Disability Benefits

#### 1.  Reviewing Relevant Medical Evidence

Plaintiff argues that it was arbitrary and capricious for defendants to rely on the conclusions of its independent reviewers because the reviewers did not meet with plaintiff, reviewed only partial records, and did not speak peer-to-peer with plaintiff's treating practitioners.  Docket No. 28 at 16, ¶ 45.

Contrary to plaintiff's assertion that the independent reviewers collectively failed to contact plaintiff's treating physicians, the record indicates that reviewing neuropsychologist Carol Walker called and left a message for Dr. Zacharewicz, but was informed that Dr. Zacharewicz was traveling for two weeks and thus would be unavailable to speak with her within the necessary time frame.  R. at 910.  Reviewing psychiatrist Marcus Goldman spoke with Dr. Sakamoto.  R. at 914.  Reviewing physician Richard Kaplan attempted to contact Dr. Yurth, but was unable to reach her. R. at 928.  Reviewing physician Pragna Patel spoke with Dr. Kearns.  R. at 907.  The facts do not support plaintiff's contention that it was arbitrary to rely on the opinions of

defendants' experts simply because they were not all able to contact plaintiff's treating physicians.

Plaintiff further argues that defendants "never sent their reviewing psychiatrist–or any other medical reviewer–any of Plaintiff's records from his treating psychiatrist, Dr. Sakomoto."  Docket No. 28 at 17, ¶ 48.  Dr. Goldman's notes state:

> Serial notes most likely from Dr. Sakamoto, throughout 2008, contain significant, at times, subjective and self-reported information with no significant findings on mental status examination that would support severe psychopathology.  At no time did Dr. Sakamoto note the presence of active or acute suicidal ideation, psychosis, mania, aggressive behavior, obtundation, vegetative signs, lethargy, altered sensorium, or loss of global functionality.  There are no psychotherapy notes for review.

R. at 917.  Plaintiff contends that Dr. Goldman's uncertainty about the source of the notes indicates that he was not, in fact, provided with Dr. Sakamoto's notes to review because those notes are clearly labeled by name.  Docket No. 34 at 12, ¶ 21.

The administrative record contains a Psychiatric History and Assessment form completed by Dr. Sakamoto.  R. at 545-50.  This form fits Dr. Goldman's description of the notes he reviewed, insofar as it does not endorse suicidal ideation or the other conditions listed by Dr. Goldman and does not contain psychotherapy notes, only notes relating to psychiatric treatment.  *See id.*  Accordingly, there is no basis for the Court to conclude that Dr. Goldman did not review Dr. Sakamoto's notes.

Furthermore, the record belies plaintiff's contention that defendants did not send "any of the Plaintiff's films, including plain film x-rays or MRI's, to any reviewer."  Docket No. 28 at 18, ¶ 50.  Drs. Patel, Walker, Kaplan, and Goldman were provided imaging from Boulder Community Hospital and Stand-Up MRI of America for review.  R. at 907, 910, 914, and 928; *see also* R. at 907 (Dr. Patel's opinion stating that plaintiff "has had

an MRI done showing cervical facet synovitis."); R. at 919 (reviewing chiropractor Monte

Horne's opinion stating that "[c]ervical x-rays revealed reversal of lordosis and anterior

head translation" and "[c]ervical and lumbar MRI failed to identify significant anatomic

lesion that correlates with clinical findings or electrodiagnostic testing"); R. at 931 (Dr.

Kaplan's opinion stating that "[a]n MRI of the lumbar spine of 6/8/08 demonstrated disc

extrusion at L5-L1").

Accordingly, there is no basis for finding that defendants arbitrarily withheld

relevant medical records from the reviewing physicians or acted arbitrarily in relying on

their opinions.

### 2. Causation

Plaintiff argues that defendants acted arbitrarily in failing to discuss or credit Dr.

Kaplan's opinion that the "claimant's depression alone would be sufficient to explain his

ongoing [cognitive] symptoms."  Plaintiff argues that this statement constitutes a finding

of disability and that the cause of such disability was not germane to the benefits

determination.  Docket No. 28 at 18, ¶ 49.

Dr. Kaplan is certified in physical medicine and rehabilitation; mental health

problems unrelated to physical injuries or impairments fall outside of his expertise.  R.

at 928 ("I have reviewed the records in this case from a physical medicine and

rehabilitation perspective.") and 932.  Dr. Kaplan reasonably limited his opinion to

matters of physical health and rehabilitation, including evidence that plaintiff was

suffering from post-concussive syndrome as a result of the 2007 car accident.  R. at

932.  It was reasonable for defendants to determine that Dr. Kaplan's statement that

"claimant's depression alone would be sufficient to explain his ongoing cognitive

symptoms" was not determinative of plaintiff's claim.  R. at 931.  Indeed, Dr. Kaplan

precluded such reliance by stating that he would "defer to a mental health professional

regarding any diagnosis, restrictions, or limitations from a mental health perspective."

R. at 932.  Likewise, defendants did not act arbitrarily in relying instead on the

conclusion of Dr. Goldman, a psychiatrist, that the "neuropsychological testing does not

support the presence of severe psychopathology or a major affective or anxiety

disorder."  R. at 943.

### 3.  Neuropsychiatric Exam

Plaintiff argues that defendants arbitrarily "denied Plaintiff's claims based in large

part on the lack of 'effort' on the one day of testing when his father was ill and the

testing was discontinued."  Docket No. 28 at 16, ¶ 45.  Defendants maintain that their

determination was based on substantial evidence.  Docket No. 30 at 23-26.

Dr. Zacharewicz stated that:

It should also be noted that on the first day of testing (07/29/08), the patient
was only tested for approximately one hour before testing was discontinued
due to his reports of fatigue and concerns that a recent downturn in his
father's health may have affected his cognitive performances.  He indicated
that he had only achieved approximately five to six hours of sleep the night
prior [to] testing . . . . [H]e asked if he could leave his cell phone on due to
concerns related to his father going to the hospital the night prior to testing
and his wish to be readily available should someone wish to contact him in
this regard. . . . His cooperation was rated as excellent while it was difficult
to assess his effort on this date due to several of the confounding issues
discussed above.

R. at 794.  Dr. Zacharewicz further stated that:

[T]he patient was administered various validity measures.  He responded to
these types of tasks on the first day of testing in a manner that raises
concerns that he may have put forth variable effort on this date; however, his
performance on validity tasks during the other three days of testing did not
raise concerns regarding poor effort.  Therefore, the results of testing

13

completed on the first day of testing should be viewed cautiously. . . .

R. at 795.  In setting forth the rationale for her opinion, reviewing neuropsychologist

Carol Walker stated that, "[d]uring one of the days of testing, Mr. Menge was noted to

have given poor effort on a measure of effort."  R. at 912-13.  In addition to the

evidence of plaintiff's effort, Dr. Walker found there was no evidence plaintiff suffered a

concussion in the 2007 accident, that he never suffered amnesia, that his test results

indicated deficits in areas resistant to traumatic brain injury, and that his score on the

Minnesota Multi-Phasic Inventory 2 ("MMPI-2") validity test suggested "over-reporting

symptoms."  R. at 913.  Dr. Walker concluded that plaintiff's "difficulty appears related

to factors outside of his neuropsychological functioning."  *Id*.

In its determination of plaintiff's appeal, the QRU stated: "Dr. Walker reviewed

that during one of the days of testing[,] Mr. Menge was noted to have given poor effort

on a measure of effort."  R. at 943.  Neither Dr. Walker's opinion nor the QRU's

decision letter mentioned the specific confounding factors noted by Dr. Zacharewicz.

Substantial evidence is "more than a scintilla, but less than a preponderance."

*Graham v. Hartford Life & Accident Ins. Co.*, 589 F.3d 1345, 1358 (10th Cir. 2009).

"Substantiality of the evidence is based upon the record as a whole."  *Caldwell v. Life*

*Ins. Co. of N. Am.*, 287 F.3d 1276, 1282 (10th Cir. 2002).  In assessing substantiality,

the Court must consider "whatever in the record fairly detracts from its weight."  *Id*.

(internal citation omitted).  In other words, the Court must take into account "whether

any information in the record undercuts the administrator's conclusion."  *Williams v.*

*Metro. Life Ins. Co.*, 459 F. App'x 719, 723 (10th Cir. 2012).

14

Plaintiff submitted the following medical evidence in support of his claim for

benefits on the basis of psychiatric, psychological, and neuropsychological

impairments: in April 2008, Dr. Kearns diagnosed plaintiff with "severe major

depression." R. at 533. She opined that she "would limit" plaintiff's "exposure at work"

out of concern that his depression would worsen. *Id*. She noted that he had a "very

difficult time concentrating" and was "unable to focus." R. at 534; *see also* R. at 535

("Kent is certainly functionally not able to participate in relationships or work at this time.

He has very little or no ability to concentrate due to some of the overwhelming stressors

in his life."). She also noted that, "[s]ince being started on the fluoxetine, he has noticed

that it definitely has helped his depression overall, but he has had a recent increase[d]

stress load in his life." *Id*. at 534.

Dr. Sakomoto's notes from April 2008 list the following limitations: "poor

concentration, anxious, not able to work." R. at 547. Dr. Sakamoto diagnosed plaintiff

with bipolar disorder and found he had a current Global Assessment of Functioning

("GAF") score of 35 and a GAF score of 55 over the past year.[5] R. at 550. In May

---

[5]"The GAF is a subjective determination based on a scale of 100 to 1 of the clinician's judgment of the individual's overall level of functioning." *Lee v. Barnhart*, 117 F. App'x 674, 678 (10th Cir. 2004) (internal citations omitted). The Diagnostic and Statistical Manual of Mental Disorders explains that a GAF score between 31 and 40 indicates "[s]ome impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child beats up younger children, is defiant at home, and is failing at school)." A score between 51 and 60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."

2008, Dr. Sakamoto found that plaintiff was doing "better," but was still "not able to work" due to "depression, anxiety, and memory problems." R. at 576-77. In June 2008, Dr. Sakamoto "recommend[ed] not working secondary to memory, concentration, focusing, depression, anxiety problems." R. at 664. In July 2008, Dr. Sakamoto found that plaintiff was "doing better mood-wise," was "sleeping better," and had better energy. R. at 809. In August 2008, Dr. Sakamoto found that plaintiff was "less anxious." R. at 811.

In September 2008, after conducting a round of neuropsychological testing, Dr. Zacharewicz opined that plaintiff "demonstrates a number of neuropsychological functional weaknesses and impairments including his demonstration of below expectation and/or impaired general intellectual abilities, attention/concentration abilities, processing speed abilities, memory/learning abilities . . ., variable higher-level reasoning/executive functioning, and impaired motor-sensory abilities."[6] R. at 800. Dr. Zacharewicz further stated that plaintiff's

> current neuropsychological presentation and his reported physical symptoms strongly indicate that he is currently unable to be reliably employed in most

---

[6]Dr. Zacharewicz noted the uncertain cause of these symptoms, explaining that plaintiff's "test results and presentation across testing dates does suggest, however, that psychological issues, psychosocial stresses, medication issues . . . and variable levels of pain and fatigue throughout testing likely contributed to at least a portion of the neuropsychological difficulties he demonstrated on testing and reports experiencing in everyday life. Given the potential confounding influences that these variables may have on his current test results and reported everyday functioning, it cannot be reliably determined if his residual symptoms are also related to the possible residual symptoms from an underlying MTBI, his significant level of psychological distress, medical issues, psychosocial stresses, pain issues, fatigue issues, or some possible combination of some or all of these potential influences." R. at 801.

16

> competitive work environments at this time.  This does not mean that he may never be able to return to competitive employment, however, if his various physical, psychological, and/or cognitive symptoms do not improve it will be very difficult for him to secure competitive employment in the future.

R. at 802.  With respect to plaintiff's emotional and psychological function, Dr.

Zacharewicz found that:

> [Plaintiff's] response to this portion of this evaluation raises concerns regarding the validity of this portion of testing due to significant elevations. . . . This pattern of validity scale elevation raises concerns of possible symptom exaggeration but may also reflect the nature and significance of the current level of psychological distress he is experiencing.  His elevated FBS score should be viewed carefully given that his reported/documented physical injuries may contribute to elevating his score on this scale, while it is possible that this elevated score may also reflect a style of a somatic focusing or over reporting in his somatic symptoms.  In general, his response to this portion of evaluation will be interpreted cautiously with these validity scale elevation noted.

R. at 799.  Dr. Zacharewicz wrote a letter on plaintiff's behalf, stating that plaintiff's

"current demonstration of various cognitive and psychological symptoms alone strongly

indicates that he is unable to be employed in most competitive work environments at

this time."  R. at 849.

In addition to Dr. Walker's statement regarding plaintiff's effort level, the QRU

cited the following evidence in finding that plaintiff was not disabled on the basis of a

psychiatric, psychological, or neuropsychological impairment:  (1) Dr. Walker's finding

that plaintiff's symptoms were not the result of traumatic brain injury and that there was

evidence of symptom exaggeration;[7] and (2) Dr. Goldman's findings that plaintiff was

not suffering from aggressive behaviors, psychosis, mania, obtundation, vegetative

---

[7]Plaintiff argues that the evidence of symptom exaggeration was unreliable and should have been disregarded by the QRU.  Docket No. 34 at 9-11, ¶ 18.  The Court addresses this argument below.

17

signs, lethargy, altered sensorium, a loss of global functionality, or a major affective or anxiety disorder and that there was evidence of symptom exaggeration.[8]  R. at 943.

Although Dr. Walker and the QRU did not interpret Dr. Zacharewicz's findings in the manner most favorable to plaintiff, their interpretation was not so extreme as to be considered arbitrary or evidence of bad faith.  Dr. Zacharewicz found that plaintiff did not put forth the same level of effort on the first day of testing and thus that the results from that day should be viewed with caution.  R. at 794.  Dr. Zacharewicz also raised concerns regarding the validity of plaintiff's emotional and psychological evaluation and signaled uncertainty regarding whether plaintiff's symptoms were related to "an underlying physical injury/ailment" or whether they were a product of "alternative etiologies."  *See* R. at 799-801.  While this Court might have placed greater emphasis on the neurological impairments identified by Dr. Zacharewicz than defendants did, that is not a sufficient basis for finding that defendants acted arbitrarily.  *See Adamson*, 455 F.3d at 1212; *Rizzi*, 613 F. Supp. 2d at 1249.

Moreover, the other evidence in the record does not seriously "undercut[] the administrator's conclusion."  *See Williams*, 459 F. App'x at 723.  Dr. Kearns opined in April and May that plaintiff's depression was improving on fluoxetine, but that life stresses were slowing his recovery.  *See* R. at 533-35.  Dr. Sakamoto also tracked improvement in plaintiff and opined that he would likely be able to work in the future.

---

[8]Dr. Goldman stated that "[s]erial notes most likely from Dr. Sakamoto, throughout 2008, contain significant, at times, subjective and self-reported information with no significant findings on mental status examination that would support severe psychopathology. . . . Mr. Menge's mood and affect as well as rapport were noted to be appropriate during all testing dates.  Mr. Menge has not required treatment in more intense levels of care . . . ."  R. at 917.

*See* R. at 809, 811.  The Court cannot say that defendants' decision was arbitrary or capricious because they relied on the opinions of the reviewing physicians that plaintiff was not precluded from performing "all of the essential [] functions of [his] job," R. at 942, over the statements of plaintiff's treating physicians that he was not capable of working in a competitive environment.  *See McDonald*, 347 F.3d at 169.

### 4.  Time Frame

Plaintiff argues that defendants acted arbitrarily in limiting their consideration on appeal to the time frame between May 19, 2008 and July 10, 2008 on the grounds that he returned to work on July 11, 2008.  Plaintiff emphasizes that he never returned to work, but instead used vacation and sick leave once his disability benefits ran out. Docket No. 28 at 23-24, ¶ 66.

Coverage under the Plan ends when "employment with the AT&T Group of Companies is terminated for any reason" unless termination is the result of "receiving the Maximum Duration of Short-Term Disability Benefits and the Claims Administrator determines, in its sole discretion, that you are eligible for Company-Provided Long-Term Disability Benefits."  R. at 176.  Short-term disability benefits are discontinued when a claimant "return[s] to work with the AT&T Group of Companies."  R. at 177, 972. "[A]ll benefits under the Program will be denied or discontinued on the earliest day that . . . [a claimant is] receiving wages from an AT&T company."  R. at 964-65.  The Plan does not define the phrase "return to work."  *See* R. at 989-93.  Accordingly, the Claims Administrator has discretion to interpret this provision.  *See* R. at 995.

Plaintiff's argument appears to be based on his interpretation of the phrase

"return to work," which he would read to signify a return to performing his full range of duties at the office. *See* R. at 769. Plaintiff does not, however, address the Plan language stating that all disability benefits terminate as soon as an employee begins to receive wages from an AT&T company. *See* R. at 964-65. Once plaintiff started taking vacation and personal days, he was receiving wages from an AT&T company. *See* R. at 781 ("we have decided to grant you sixty (60) calendar days from the date of this letter, or until September 14, 2008, at full salary and benefits (including your personal days and vacation days) to remotely access the Company's human resource systems"). Under the terms of the Plan, it was not arbitrary for the QRU to limit its review to the period when plaintiff was eligible to receive short-term disability benefits, namely, the period during which he was not receiving other wages from AT&T.[9]

### 5. *Irrelevant Information*

Plaintiff argues that defendants' decision was arbitrary insofar as it relied on irrelevant information. Docket No. 28 at 19, ¶ 51. Specifically, plaintiff cites portions of defendants' claim-handling records that refer to issues not directly relevant to evaluating plaintiff's claim. Docket No. 34 at 7, ¶ 11 (citing R. at 451 ("Outpatient therapy, with serious job satisfaction issues;" "EE still with depression, SI w/o plan or intent, poor concentration, distractibility, lack of focus and involved in legal battle w/ AT&T"), 453, 457, 467, and 474).

---

[9]Furthermore, plaintiff does not explain how extending the time frame under review would have altered defendants' conclusions. The medical evidence in the record does not extend past fall 2008, *see, e.g.*, R. at 814, 849, 856, and there is no indication that defendants disregarded any of the medical evidence submitted by plaintiff in their review.

The statements that plaintiff cites are medical assessments of his overall health and well-being and seem intended to explain and provide context for his mental health symptoms.[10]  *See id*.  These statements are not mentioned in the initial denial of plaintiff's benefits claim or in the QRU's denial of plaintiff's appeal.  *See* R. at 639-41, 942-44.  There is no basis for concluding that these factors were improperly considered at any stage of the decision-making process.

### 6.  Job Description

Plaintiff argues that it "does not appear from the record that a job description was provided, and no opinions as to Plaintiff's ability to meet any job requirement was given to the Defendants for their consideration of Plaintiff's claim."  Docket No. 34 at 7, ¶ 12.

The record does not support this contention.  The form sent to the independent reviewing physicians contains a description of plaintiff's job that plaintiff's supervisor provided to the Claims Administrator.  R. at 901.  In addition, several independent reviewers specifically referred to the requirements of plaintiff's job.  *See* R. at 363-64 ("Job duties are conducted in office setting at a desk by use of direct contact, phone, and E-mails."); R. at 919 ("The claimant's occupation PDL requirements are a PDL of sedentary with the availability of modified duty.").  Plaintiff's argument on this point is unavailing.

### 7.  Minnesota Multi-Phasic Inventory-2

Plaintiff argues that defendants acted unfairly in relying in part on the conclusion

---

[10]The Court notes that plaintiff's dissatisfaction with his job and his involvement in a legal battle with AT&T were cited by Dr. Kearns as external stressors in his life.  *See* R. at 534-36, 540-41.

of Drs. Walker and Goldman that plaintiff was exaggerating his symptoms, *see* R. at

913, because this conclusion was based on the results of a particular validity scale

included in the Minnesota Multiphasic Personality Inventory-2 ("MMPI-2") that Dr.

Zacharewicz administered to plaintiff,[11] which plaintiff contends is not a reliable basis for

a medical opinion.  Docket No. 34 at 9-11, ¶ 18.

The validity scale in question, the"fake bad scale" ("FBS"), is used to assess a

claimant's credibility with regard to symptoms of physical and mental impairment.  The

FBS is subject to some controversy, both in the courts and in the relevant scientific

community.  *Compare Bowling v. United States*, 740 F. Supp. 2d 1240, 1266 (D. Kan.

2010) (describing the FBS as a "test that is accepted in the field [of neuropsychology]

as evidence of malingering") *with Bradley v. Astrue*, 2012 WL 5878612, at *6 (D. Kan.

Nov. 21, 2012) (noting that "it is against the policy of the Social Security Administration

to purchase these malingering tests, much less place great weight on them") *and*

*Williams v. CSX Transportation, Inc.*, No. 04-CA-008892 ("Order on Frye Hearing on

MMPI-2 'Fake Bad Scale'") at 11, ¶ 12 (Fla. Cir. Ct. Sep. 19, 2007) ("The Court

concludes that the FBS is very subjective and dependant on the interpretation of the

person using or interpreting it. . . . [T]his coupled with the acknowledged bias against

---

[11]The MMPI-2 is a personality inventory used to "assess and diagnose mental illness."  It contains over five-hundred true and false questions and, in addition to evaluating individuals on ten clinical scales, it contains four validity scales, which "assess the person's general test-taking attitude and whether he answered the items on the test in a truthful and accurate manner."  *Torgerson v. Colvin*, 2013 WL 4543312, at *19 n.16 (W.D.Mo. Aug. 27, 2013).

women and those with demonstrated serious injuries make the FBS unreliable.");[12] *see also* Social Security Program Operations Manual System (POMS) DI 22510.006(D) (When Not to Purchase a Consultative Examination) ("Tests cannot prove whether a claimant is credible or malingering because there is no test that, when passed or failed, conclusively determines the presence of inaccurate self-reporting.").[13]

Plaintiff cites an article written by two plaintiff's lawyers and a neuropsychologist, which posits that a high score on the MMPI-2 may be an "indication of true brain impairment versus symptom amplification" because many of the statements used to support a finding of malingering are those one would "expect a person with brain damage to endorse." *See* Docket No. 34-1 at 1 (Dorothy Sims, Richard Perillo, & Richard B. Berman, *An Autopsy on the Fake Bad Scale*, International Brain Injury Association (Oct. 2009)). Plaintiff states that he "wants to alert the Court to the controversial validity of this testing" and argues that "[u]tilization of this scale . . . was not fair to Mr. Menge." Docket No. 34 at 11, ¶ 18.

The Court is mindful that plaintiff's own neuropsychologist, Dr. Zacharewicz, administered the disputed test to plaintiff and included the results in his assessment of plaintiff's disability. *See* R. at 799. Furthermore, other courts in this Circuit have admitted the results of validity tests into evidence as recently as 2010. *See Bowling*, 740 F. Supp. 2d at 1266. Although the articles submitted by plaintiff indicate

_____

[12]*Available at* http://www.creagerlawfirm.com/wp-content/uploads/florida-orders-from-dorothy-sims-re-fake-bad-scale-malingering-etc.pdf, at 16-27.

[13]*Available at* https://secure.ssa.gov/apps10/poms.nsf/lnx/0422510006.

disagreement in the scientific community regarding the use of such tests, there is not a sufficient consensus for the Court to determine that they are unreliable in all instances as a matter of law.  It was neither arbitrary nor capricious for defendants to rely in part on this evidence, submitted in the first instance by plaintiff's treating neuropsychologist.

### B.  Denial of Long-Term Disability Benefits

Plaintiff argues that defendants acted unreasonably in denying plaintiff's claim for long-term disability benefits on the basis that he never qualified for the maximum amount of short-term disability benefits.  Docket No. 28 at 22-23, ¶¶ 64-65 ("the plan administrator cannot prevent a claimant from obtaining long term disability benefits by the simple expedient of wrongfully denying short term disability benefits").

As the Court concludes that defendants did not arbitrarily or wrongfully deny plaintiff's claim for short-term disability benefits, there is no basis for finding that they wrongfully denied his claim for long-term disability benefits.  It is undisputed that, under the Plan, receipt of the maximum period of short-term benefits is a precondition to eligibility for long-term benefits.  *See* Docket No. 28 at 8, ¶ 21; Docket No. 30 at 27. Plaintiff does not argue that this is a unique or unreasonable provision to include in a disability benefits plan, only that the purportedly wrongful denial of his short-term benefits should not permit the automatic denial of his claim for long-term benefits.  *See* Docket No. 28 at 23, ¶ 65.  This argument is unavailing.

### C.  Penalty Under 29 U.S.C. § 1132(c)(1)

Plaintiff argues that defendants are liable under 29 U.S.C. § 1132(c)(1)[14]

---

[14]Under ERISA, any administrator who "fails or refuses to comply with a request for any information which such administrator is required to furnish to a participant or

because they "failed to timely provide to Plaintiff copies of his file regarding his claim for

benefits, and failed to provide Plan documents on request."  Docket No. 28 at 20, ¶ 54.

Defendants counter that plaintiff failed to assert this claim for relief in his complaint.

Docket No. 30 at 26.

> In his complaint, plaintiff alleged that:
>
> Defendant AT&T failed to timely provide to Plaintiff copies of his file
> regarding his claim for benefits, and failed to provide Plan documents on
> request, entitling Plaintiff to recover as provided for and in the amounts set
> forth under the ERISA statute of at least $110.00 per day until the
> documents have been received by Plaintiff or his counsel.

Docket No. 1 at 4, ¶ 24; *see also id*. at 5, 15 ¶¶ 29, 72.  His requested relief included

"an amount as set forth in the ERISA statute and otherwise for the failure of Defendant

to produce Plaintiff's records and plan documents in a timely manner, but no less than

$110 per day."  *Id*. at 15-16, ¶ 74(D).  These statements are sufficient to state a claim

for violation of 29 U.S.C. § 1132(c)(1) and put defendants on notice of such claim, even

though they do not cite the specific statute under which plaintiff seeks relief.  *See, e.g.,*

*Cooper v. Caldera*, 96 F. Supp. 2d 1160, 1164-65 (D. Kan. 2000) (failure to "identify

specific laws or regulations that defendant violated" was not failure to state a claim

under notice pleading standard).

However, plaintiff offers only conclusory allegations in support of this claim.  He

states that he received "an ever changing mosaic of plan documents" that "resulted in a

moving target as to what he needed to prove in order to establish his claim for benefits,"

---

beneficiary . . . by mailing the material requested to the last known address of the
requesting participant or beneficiary within 30 days after such request may in the court's
discretion be personally liable to such participant or beneficiary in the amount of up to
$100 a day from the date of such failure or refusal."  29 U.S.C. § 1132(c)(1).

but that, "[t]hrough the good offices of Defendants' counsel it now appears that, probably, all plan documents have been received."  Docket No. 28 at 19-20, ¶¶ 52-55. Plaintiff states that "AT&T failed to timely provide to Plaintiff copies of his file regarding his claim for benefits, and failed to provide Plan documents on request, entitling Plaintiff to recover as provided for" under ERISA.  *Id*. at 20, ¶ 54.  Plaintiff does not, however, provide citations to the record in support of this allegation or specify when he requested copies of plan documents or his file that went unmet.  It appears that plaintiff requested plan documents on October 8, 2008; May 14, 2010; October 20, 2010; and November 5, 2010,  Docket No. 30-5 at 1-6, and that defendants timely responded to each request on, respectively, October 21, 2008; May 24, 2010; and November 16, 2010.  Docket No. 30-6 at 1-3.

Absent factual support, plaintiff's claim for statutory penalties cannot succeed.

## IV.  CONCLUSION

As the Court finds that the denial of plaintiff's claim for disability benefits was neither arbitrary nor capricious, it need not address the question of who the proper defendants are in this matter.  *See* Docket No. 30 at 28-29.  For the foregoing reasons, it is

**ORDERED** that the February 27, 2009 decision of the AT&T Integrated Disability Service Center Qualified Review Unit upholding the denial of Mr. Menge's claim for short-term disability benefits from May 19, 2008 through July 10, 2008, *see* R. at 942-44, is AFFIRMED.  It is further

**ORDERED** that plaintiff's claim for a statutory penalty pursuant to 29 U.S.C.

§ 1132(c)(1) is DENIED.  It is further

**ORDERED** that this case is CLOSED.


DATED March 25, 2014.

BY THE COURT:


  s/Philip A. Brimmer
PHILIP A. BRIMMER
United States District Judge